SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court and may not summarize all portions of the opinion.

<u>**M.R. v. New Jersey Department of Corrections**</u> **(A-53-23) (089371)**

**Argued November 18, 2024 -- Decided July 28, 2025**

**HOFFMAN, J., writing for a unanimous Court.**

In this case, the Court reviews the Compassionate Release Act (CRA), N.J.S.A. 30:4-123.51e, and its implementing regulation, N.J.A.C. 10A:16-8.6, to determine whether physicians retained by the New Jersey Department of Corrections (DOC) are required to conduct a physical examination to render an acceptable medical diagnosis for inmates applying for compassionate release. Additionally, the Court examines whether it was arbitrary, capricious, or unreasonable for the DOC to deny appellant M.R. a Certificate of Eligibility in August 2023.

On August 20, 2020, while serving a prison sentence for racketeering, M.R. was examined in person by Dr. Javier Taboada because he was having trouble maintaining balance and writing legibly. The following day, M.R. was admitted to St. Francis Medical Center for a neurological evaluation, and he was subsequently diagnosed with a malignant form of brain cancer. In January 2021, M.R. underwent surgery to remove the malignant tumor. On November 16, 2022, M.R. visited Dr. Geetha Hrishikesan for a chronic care consultation. The physician noted that M.R. was wheelchair-bound and suffered from "residual neurologic deficits."

In February 2023, M.R. applied for compassionate release. The DOC designated Drs. Jeffrey Pomerantz and Ruppert Hawes to provide attestation reports regarding M.R.'s medical diagnosis. Neither physician conducted an in-person physical examination of M.R., but instead relied on M.R.'s electronic medical record, including the report by Dr. Taboada from 29 months earlier. Dr. Pomerantz determined that M.R. was not physically incapacitated but concluded that M.R. did suffer from a terminal condition. Dr. Hawes also determined that M.R. did not suffer from a permanent physical incapacity but concluded that M.R.'s condition was not terminal. Dr. Herbert Kaldany, acting on behalf of the DOC's health services medical director, reviewed the physicians' attestation reports and concluded that M.R. was not eligible for compassionate release. On February 27, 2023, Lisa Palmiere, Director of Classification of the DOC's Division of Operations, issued the DOC's final administrative decision, informing M.R. that he was ineligible for compassionate release.

1

M.R. appealed and, in August 2023, the Appellate Division remanded to allow the DOC to reevaluate M.R.'s eligibility in light of Dr. Pomerantz's and Dr. Hawes's conflicting terminality prognoses. On August 22, 2023, Drs. Pomerantz and Hawes provided updated reports, now uniformly concluding that M.R. did not suffer from a terminal condition or permanent physical incapacity. Once again, both physicians relied solely on M.R.'s electronic medical record. Based upon the updated attestations, Dr. Kaldany again concluded that "there is no evidence that [M.R.] is suffering from a terminal condition . . . or permanent physical incapacity." On August 24, the DOC denied M.R. a Certificate of Eligibility for the second time.

On April 19, 2024, the Appellate Division affirmed the DOC's decision to deny M.R. a Certificate of Eligibility. 478 N.J. Super. 377, 380 (App. Div. 2024). The court concluded that the CRA does not require physical examinations and that the denial was not arbitrary, capricious, or unreasonable. Id. at 388, 391.

In May 2024, M.R. petitioned for certification. M.R. died the next month, but the Court granted certification, 258 N.J. 265 (2024), and reviews the case although moot because the issue raised is of substantial importance and capable of repetition yet evading review.

**HELD:** Based on the CRA's plain language, as well as the legislative history and fundamental purpose of compassionate release, the Court agrees with the Appellate Division that physical examinations are not statutorily mandated to render a medical diagnosis that complies with the statute. The Court concludes, however, that the DOC's decision to deny M.R. a Certificate of Eligibility in August 2023 was arbitrary, capricious, and unreasonable. Every applicant seeking compassionate release must be examined for both a terminal condition and a permanent physical incapacity. In this instance, the medical records relied upon by the DOC's attesting physicians, as well as their corresponding explanations, were insufficient to support the agency's conclusion that M.R. did not suffer from such a physical incapacity.

1. The CRA reflects the Legislature's intent to show compassion to people with serious medical needs, decrease the prison population, and reduce healthcare costs for correctional facilities by broadening the number of inmates who could apply for compassionate release and by transferring the power to grant release from the Parole Board to the courts. Before inmates can petition the court for release, however, they must first obtain a Certificate of Eligibility from the DOC. The Certificate requires a diagnosis by two licensed physicians. N.J.S.A. 30:4-123.51e(b). Should the physicians indicate that an applicant suffers from either a terminal condition or permanent physical incapacity, the DOC's Division of Operations "shall promptly issue to the inmate a Certificate of Eligibility." Id. at (d)(2). Upon issuance, an inmate may petition for compassionate release. The CRA does not expressly require that an attesting physician's "diagnosis" be based on a physical examination; rather,

2

it is silent as to the process attesting physicians must follow to render their diagnoses. And although N.J.A.C. 10A:16-8.6, the relevant implementing regulation, references an "examination," it too is silent as to the nature of the examination required. (pp. 15-18)

2. Reviewing the plain language of the statute and regulation and the meanings of the terms they contain, the Court does not find that either implicitly requires a physical examination. Moreover, in other statutes and regulations, the type of examination required has been specified, but that was not done here; the word "physical" could have been but was not added, and the Court will not read that requirement into the statutory or regulatory text. (pp. 18-23)

3. Although physical examinations are not mandated under either the CRA or its regulatory scheme, the Court cannot conclude that the DOC's August 2023 decision to deny M.R. a Certificate of Eligibility was supported by substantial credible record evidence. The medical entries relied upon by the DOC medical director and the DOC's designated physicians did not provide an adequate foundation upon which to conclude that, as of August 23, 2023, M.R. was not permanently physically incapacitated. Likewise, the physicians' corresponding reports and the medical director's memorandum do not allow for meaningful appellate review. Due to the potential for dynamic and unpredictable changes in the condition of inmates suffering from rapidly declining physical or mental health, contemporaneity is essential, particularly for a statute written in the present tense: N.J.S.A. 30:4-123.51e(b) requires a determination of "whether the inmate is eligible for compassionate release." (emphasis added). Given that, as early as September 2020, M.R. suffered from "progressive" and "residual" neurological deficits and struggled with several of the relevant activities of basic daily living, the DOC and its attesting physicians should have ascertained the current state of M.R.'s physical condition before concluding that he was not physically incapacitated as of August 2023. M.R.'s February 2023 application similarly underscores the timeliness problems inherent in the DOC's implementation of the CRA. (pp. 24-27)

4. Moreover, the physicians' August 2023 attestation reports provided insufficient explanation for why M.R. did not suffer from a permanent physical incapacity; each simply stated, "No -- does not require 24-hour care." That denies the opportunity for meaningful appellate review. The Court provides guidance as to the information that the reports should contain going forward. (pp. 27-28)

**REVERSED.**

**CHIEF JUSTICE RABNER and JUSTICES PATTERSON, PIERRE-LOUIS, WAINER APTER, FASCIALE, and NORIEGA join in JUSTICE HOFFMAN's opinion.**

3

SUPREME COURT OF NEW JERSEY
A-53 September Term 2023
089371

M.R.,

Appellant-Appellant,

v.

New Jersey Department
of Corrections,

Respondent-Respondent.

On certification to the Superior Court,
Appellate Division, whose opinion is reported at
478 N.J. Super. 377 (App. Div. 2024).

| Argued | Decided |
| --- | --- |
| November 18, 2024 | July 28, 2025 |

Colin Sheehan, Assistant Deputy Public Defender, argued the cause for appellant (Jennifer N. Sellitti, Public Defender, attorney; Colin Sheehan, of counsel and on the briefs).

Brett J. Haroldson, Deputy Attorney General, argued the cause for respondent (Matthew J. Platkin, Attorney General, attorney; Donna Arons, Assistant Attorney General, of counsel, and Christopher C. Josephson, Deputy Attorney General, on the briefs).

Joshua P. Law argued the cause for amicus curiae Association of Criminal Defense Lawyers of New Jersey (Pashman Stein Walder Hayden, attorneys; Joshua P. Law, of counsel and on the brief).

In this case, we review the Compassionate Release Act (CRA), N.J.S.A. 30:4-123.51e, and its implementing regulation, N.J.A.C. 10A:16-8.6, to determine whether physicians retained by the New Jersey Department of Corrections (DOC) are required to conduct a physical examination to render an acceptable medical diagnosis for inmates applying for compassionate release. Additionally, we examine whether it was arbitrary, capricious, or unreasonable for the DOC to deny appellant M.R. a Certificate of Eligibility in August 2023.

Under the CRA, inmates diagnosed with a terminal condition or permanent physical incapacity are permitted to petition the Superior Court for compassionate release. The CRA does not, however, indicate the method or process necessary for rendering that diagnosis. Based on the statute's plain language, as well as the legislative history and fundamental purpose of compassionate release, we agree with the Appellate Division that physical examinations are not statutorily mandated to render a medical diagnosis that complies with the statute.

We conclude, however, that the DOC's decision to deny M.R. a Certificate of Eligibility in August 2023 was arbitrary, capricious, and unreasonable. Every applicant seeking compassionate release must be

2

examined for both a terminal condition and a permanent physical incapacity. In this instance, the medical records relied upon by the DOC's attesting physicians, as well as their corresponding explanations, were insufficient to support the agency's conclusion that M.R. did not suffer from such a physical incapacity. We therefore reverse the judgment of the Appellate Division. Had we been afforded the opportunity to review this decision prior to subsequent developments in the case -- namely, M.R.'s passing -- we would have remanded the matter back to the DOC and directed it to conduct a more comprehensive and contemporaneous evaluation.

I.

The underlying facts of this appeal are not in dispute. In 2015, M.R.[1] pled guilty to a first-degree racketeering charge and was sentenced to sixteen years in prison, subject to an eighty-five-percent parole ineligibility period under the No Early Release Act, N.J.S.A. 2C:43-7.2.

On August 20, 2020, while M.R. was serving his sentence at Northern State Prison in Newark, neurologist Dr. Javier Taboada conducted an in-person physical examination of M.R., who was having trouble maintaining balance

---

[1] We use initials to refer to M.R. because we discuss his medical condition. See State v. A.M., 252 N.J. 432, 447 (2023) ("[I]f a court details a defendant's medical condition in a compassionate release proceeding, it cannot identify the defendant by name.").

3

and writing legibly. After a follow-up telemedicine consultation on September 10, 2020, Dr. Taboada noted that M.R. suffered from "progressive neurological deficits with ataxic gait,[2] speech dysarthria,[3] and loss of dexterity on his hands predominantly on the right" and that recent magnetic resonance imaging (MRI) revealed an "abnormality" in M.R.'s brain. The following day, M.R. was admitted to St. Francis Medical Center for a neurological evaluation, and he was subsequently diagnosed with medulloblastoma, a malignant form of brain cancer. On January 14, 2021, M.R. underwent surgery to remove the malignant tumor. In September 2022, follow-up MRI scans showed that there was "[n]o evidence of any mass lesion" in M.R.'s brain and "[n]o evidence of any metastasis" to his spine.

On November 16, 2022, M.R. visited Dr. Geetha Hrishikesan for a chronic care consultation. The physician noted that M.R. was wheelchair-bound and suffered from "residual neurologic deficits." The report also noted

---

[2] An "ataxic gait" is the result of damage to the cerebellum or spinal column, which causes clumsy and uncoordinated movement. See Ataxia, Stedman's Medical Dictionary 172 (28th ed. 2006).

[3] "Dysarthria" is a speech disorder that causes slurred or slow speech that can be difficult to understand. Id. at 595.

4

that M.R. recently requested physical therapy "to help with ambulation and toileting" and that an additional MRI was scheduled for December 2022.[4]

## A.

On or about February 9, 2023, M.R. applied for compassionate release. To determine whether M.R. was eligible under the CRA, the DOC designated Drs. Jeffrey Pomerantz and Ruppert Hawes to provide attestation reports regarding M.R.'s medical diagnosis. Neither physician conducted an in-person physical examination of M.R., but instead relied on M.R.'s electronic medical record to formulate their respective diagnoses.

Dr. Pomerantz provided his report on February 9, 2023. He determined that M.R. was not physically incapacitated but concluded that M.R. did suffer from a terminal condition.[5] Under "Explain," Dr. Pomerantz stated: "neurologist documents 'progressive neurological deficits with ataxic gait, speech dysarthria, and loss of dexterity on his hands predominantly on the

---

[4] It is unclear from the record whether M.R.'s planned December 2022 MRI took place.

[5] The Legislature defined a "terminal condition, disease, or syndrome" as a prognosis "that an inmate has six months or less to live." N.J.S.A. 30:4-123.51e(*l*). "Permanent physical incapacity" is defined as a medical condition that "did not exist at the time of sentencing" that "renders the inmate permanently unable to perform activities of basic daily living [and] results in the inmate requiring 24-hour care." Ibid.

right.'"  Notably, the quoted neurologist, Dr. Taboada, had documented these symptoms in a consultation report compiled on August 20, 2020 -- more than twenty-nine months earlier.

Dr. Hawes provided his report the following week.  Dr. Hawes also determined that M.R. did not suffer from a permanent physical incapacity, but, in contrast to Dr. Pomerantz's prognosis, Dr. Hawes concluded that M.R.'s condition was not terminal.  Under "Continuing Care Needs," Dr. Hawes noted that M.R. suffered from "residual neurologic defecits [sic] (dysarthria, cranial 7 palsy, lack of coordination)."  This language was taken verbatim from Dr. Hrishikesan's November 2022 consultation.

Dr. Herbert Kaldany, acting on behalf of the DOC's health services medical director, reviewed the physicians' attestation reports and concluded that M.R. was not eligible for compassionate release.  In a one-page memorandum submitted to the DOC Commissioner on February 22, 2023, Dr. Kaldany erroneously noted that both physicians' attestation reports "state that [M.R.] does not have . . . a prognosis of less than six (6) months nor does he require 24-hour assistance with activities of daily living (ADLs)," despite Dr. Pomerantz having concluded otherwise.  The memorandum did not provide evidentiary support, such as recent MRI results or entries from M.R.'s medical record, but rather pointed solely to the attesting physicians' reports.

On February 27, 2023, Lisa Palmiere, Director of Classification of the DOC's Division of Operations, issued the DOC's final administrative decision, informing M.R. that he was ineligible for compassionate release. Palmiere stated that the physicians' diagnoses did not indicate that M.R. suffered from a terminal condition or a permanent physical incapacity.

B.

On May 19, 2023, M.R. filed an appeal of the DOC's decision pursuant to Rule 2:2-3(a)(2). On August 14, 2023, the Appellate Division remanded the matter to allow the DOC to reevaluate M.R.'s eligibility in light of Dr. Pomerantz's and Dr. Hawes's conflicting terminality prognoses. The DOC stated that should the physicians' conclusions remain in conflict, it would seek the opinion of a third doctor. The Appellate Division instructed that the new reports be completed within thirty days.

On August 22, 2023, Drs. Pomerantz and Hawes provided updated reports, now uniformly concluding that M.R. did not suffer from a terminal condition or permanent physical incapacity.[6] Once again, both physicians relied solely on M.R.'s electronic medical record.

---

[6] After the Office of the Attorney General requested clarification regarding Dr. Pomerantz's change in prognosis, the medical director of University Correctional Healthcare -- the medical provider under contract with the State overseeing the DOC's attesting physicians -- explained that Dr. Pomerantz's

7

Under "diagnosis," Dr. Hawes stated that M.R. "has moderate-severe dysarthria and suspected voice impairment, as evidenced by imprecise articulation, decreased secretion management, irregular/slow rate of speech, and strained and breathy vocal quality." This language first appeared in a speech language pathology report compiled four months prior. Dr. Pomerantz provided the same language, stating that M.R. "has moderate to severe dysarthria & voice impa[i]rment."

Under "Continuing Care Needs," Dr. Hawes once again copied Dr. Hrishikesan's November 2022 report -- now nine months old -- stating that M.R. suffered from "residual neurologic deficits (dysarthria, cranial 7 palsy, lack of coordination)."

Both physicians concluded that M.R. did not suffer from a terminal condition. In support, the physicians pointed to MRI scans conducted on July 17, 2023, which showed "no evidence of recurrence" of M.R.'s brain cancer. The physicians also concluded that M.R. did not suffer from a permanent physical incapacity, stating without further explanation, "No -- does not require 24-hour care."

_____

initial report "made an error in indicating [M.R.] had a terminal illness." No further explanation was provided.

8

Based upon the updated attestations, Dr. Kaldany again concluded that "there is no evidence that [M.R.] is suffering from a terminal condition . . . or permanent physical incapacity." He notified the DOC on August 23, 2023, that M.R. was ineligible for compassionate release. Dr. Kaldany explained that M.R.'s July 2023 MRI scans showed "no evidence of recurrence," but noted that ongoing specialty care was necessary due to "the residual neurologic deficits of [M.R.'s] diagnosis" -- invoking Dr. Hrishikesan's November 2022 report.

On August 24, 2023, the DOC denied M.R. a Certificate of Eligibility for the second time, noting that there was "no indication" that he was eligible for compassionate release. M.R. filed an amended notice of appeal the following month.

C.

On April 19, 2024, the Appellate Division affirmed the DOC's decision to deny M.R. a Certificate of Eligibility. M.R. v. Dep't of Corr., 478 N.J. Super. 377, 380 (App. Div. 2024). The court concluded that the CRA does not require physical examinations and that the DOC's decision to deny M.R. a Certificate of Eligibility in August 2023 was not arbitrary, capricious, or unreasonable. Id. at 388, 391.

9

The appellate court examined the plain language of the CRA and determined that "the statute says absolutely nothing about a physical examination." Id. at 388. Similarly, the court found no explicit mention of "physical" examinations in the DOC's implementing regulation. Id. at 389. As for the evidence supporting the DOC's decision, the court held that Drs. Pomerantz and Hawes "addressed each of the four subject matters" that the Legislature required and that "the reasons for their conclusions are clear." Id. at 390. The court highlighted M.R.'s negative MRI results and the lack of "evidence of a permanent physical incapacity as defined by the statute" in concluding that "[t]he DOC's decision [was] supported by substantial credible evidence." Id. at 390-91.

In May 2024, M.R. petitioned this Court for certification. Over the following weeks, M.R.'s counsel supplemented the petition's summary of facts, reporting, most significantly, that an MRI scan conducted on May 12, 2024, revealed the recurrence of M.R.'s brain tumor. On May 28, 2024, M.R. reapplied for compassionate release and he was granted a Certificate of Eligibility on June 7, 2024.

Ten days later, before he was able to petition the Superior Court for release, M.R. died at University Hospital in Newark. On July 23, 2024, at the request of M.R.'s counsel, this Court granted certification to review the DOC's

10

August 2023 decision to deny M.R. a Certificate.  258 N.J. 265 (2024).[7]  We granted leave to appear as amicus curiae to the Association of Criminal Defense Lawyers of New Jersey (ACDL).

## II.

### A.

M.R. contends that the plain language of the CRA, which states that attesting physicians must make a "medical diagnosis," requires physicians to conduct a physical examination.  To the extent the statute creates an ambiguity, M.R. submits that the CRA "as a whole" and its legislative history further support this interpretation.  M.R. asserts that the Appellate Division's overly restrictive interpretation of the CRA runs counter to the legislative goal of increasing compassionate release.

Additionally, M.R. argues that the DOC's decision to deny compassionate release in August 2023 was arbitrary, capricious, and

---

[7]  M.R.'s appeal technically became moot when he died.  However, we will decide cases that become moot on appeal if they raise issues that "are of substantial importance and are capable of repetition, yet evade review."  Mistrick v. Div. of Med. Assistance & Health Servs., 154 N.J. 158, 165 (1998).  The standard for acquiring a Certificate of Eligibility under the CRA is of substantial importance, and it is "capable of repetition" yet "evading review" because CRA applicants may pass away before their cases have been finally adjudicated.  We therefore conclude that this case is "justiciable despite [M.R.'s] passing."  State v. Cassidy, 235 N.J. 482, 491 (2018).

11

unreasonable because it relied upon "barebones" and "stale" attestation reports that failed to provide adequate explanation and denied the opportunity for meaningful appellate review.

## B.

The DOC counters that the Appellate Division correctly determined that nothing in the text or legislative history of the CRA mandates a physical examination for every applicant and that such an obligation has the potential to complicate and delay compassionate release, not streamline it.

Additionally, the DOC submits that its August 2023 denial of a Certificate of Eligibility was not arbitrary, capricious, or unreasonable because Drs. Pomerantz and Hawes complied with the evaluation standards laid out in the CRA and no further explanation for their conclusions was necessary.

## C.

The ACDL supports M.R.'s position that the CRA's plain language requires physical examinations. Additionally, it argues that the DOC must conduct two independent examinations, and that solely conducting a medical record review would impermissibly allow a "third examining medical professional" -- namely, the physician who compiled the initial entry in the applicant's medical record -- to effectively circumvent that requirement. The ACDL suggests that reviewing "already-existing medical records," rather than

12

physically examining applicants for the purpose of diagnosing their present condition, allows attesting physicians to rubberstamp "cold" observations made months prior.

## III.

The principles governing appellate review of an administrative agency's decisions are well-settled. Our review is limited, and a decision must be sustained unless it is arbitrary, capricious, or unreasonable. In re DiGuglielmo, 252 N.J. 350, 359 (2022). To determine whether that standard is met, a reviewing court examines:

> (1) whether the agency's action violates express or implied legislative policies, that is, did the agency follow the law; (2) whether the record contains substantial evidence to support the findings on which the agency based its action; and (3) whether in applying the legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors.
>
> [In re Stallworth, 208 N.J. 182, 194 (2011) (quoting In re Carter, 191 N.J. 474, 482-83 (2007)).]

If substantial evidence supports the agency's decision, this Court "may not substitute its own judgment for the agency's even though the court might have reached a different result." Greenwood v. State Police Training Ctr., 127 N.J. 500, 513 (1992). Our review, however, is not "perfunctory," nor is it the Court's function to merely "rubberstamp an agency's decision." Berta v. N.J. State Parole

13

Bd., 473 N.J. Super. 284, 303 (App. Div. 2022) (quotation omitted).  Rather, we must engage in a "careful and principled consideration of the agency record and findings."  In re Young, 202 N.J. 50, 70 (2010) (quoting Campbell v. N.J. Racing Comm'n, 169 N.J. 579, 587 (2001)).  Indeed, "the obligation that there be substantial evidence in the record requires a sifting of the record, and the ability to find support for the conclusions reached by" the agency under the requisite statutory framework.  In re Quest Acad. Charter Sch., 216 N.J. 370, 387 (2013).

Here, that statutory framework is the CRA.  In construing the requirements of the CRA, we rely on familiar principles of statutory interpretation to give effect to the Legislature's intent.  State v. A.M., 252 N.J. 432, 450 (2023).  We begin by looking to the statute's plain language, ibid., and "presume that the Legislature intended the words that it chose and the plain and ordinary meaning ascribed to those words" unless the statute includes specific definitions, Paff v. Galloway Township, 229 N.J. 340, 353 (2017); accord N.J.S.A. 1:1-1 ("In the construction of the laws and statutes of this state, both civil and criminal, words and phrases shall be read and construed with their context, and shall, unless inconsistent with the manifest intent of the legislature or unless another or different meaning is expressly

14

indicated, be given their generally accepted meaning, according to the approved usage of the language.").

In interpreting the statute's plain text, "we endeavor to give meaning to all words and to avoid an interpretation that reduces specific language to mere surplusage." DKM Residential Props. Corp. v. Township of Montgomery, 182 N.J. 296, 307 (2005). By the same token, "[w]e cannot 'write in an additional qualification which the Legislature pointedly omitted in drafting its own enactment.'" DiProspero v. Penn, 183 N.J. 477, 492 (2005) (quoting Craster v. Bd. of Comm'rs of Newark, 9 N.J. 225, 230 (1952)). "If the language is clear, the court's job is complete." In re D.J.B., 216 N.J. 433, 440 (2014). We interpret regulations in the same way we interpret statutes. US Bank, N.A. v. Hough, 210 N.J. 187, 199 (2012).

## IV.

## A.

The CRA reflects "the Legislature's intent to show compassion to people with serious medical needs, decrease the prison population, and reduce healthcare costs for correctional facilities." A.M., 252 N.J. at 438. The CRA replaced the Medical Parole Act and expanded upon its predecessor in two ways. First, it "broaden[ed] the number of inmates who could apply" for compassionate release by removing the prior law's eligibility restrictions,

which had barred inmates convicted of certain serious offenses from applying. Id. at 458. Additionally, it created a "more expedited process" for applicants, id. at 457, which "transferred the power to grant release from the Parole Board to the courts," id. at 440.

Before inmates can petition the court for release, however, they must first obtain a Certificate of Eligibility from the DOC. Id. at 441. To determine whether an inmate is eligible for a Certificate, the DOC Commissioner must "establish and maintain a process by which an inmate may obtain a medical diagnosis." N.J.S.A. 30:4-123.51e(b). The inmate's medical diagnosis must "be made by two licensed physicians designated by the commissioner," and "[t]he diagnosis shall include, but not be limited to," the following:

> (1) a description of the terminal condition, disease or syndrome, or permanent physical incapacity;
>
> (2) a prognosis concerning the likelihood of recovery from the terminal condition, disease or syndrome, or permanent physical incapacity;
>
> (3) a description of the inmate's physical incapacity, if appropriate; and
>
> (4) a description of the type of ongoing treatment that would be required if the inmate is granted compassionate release.
>
> [Ibid.]

16

Following the enactment of the CRA, the DOC adopted a series of implementing regulations. In N.J.A.C. 10A:16-8.5, the DOC explains how to initiate and obtain a "medical diagnosis to determine an inmate's eligibility for compassionate release," in keeping with the Legislature's direction in N.J.S.A. 30:4-123.51e(b). N.J.A.C. 10A:16-8.6, in turn, explains what becomes of those diagnoses: physicians must "complete the required examinations and forward their attestations, and all related medical records, to the health services unit medical director for review." N.J.A.C. 10A:16-8.6(a).[8] Next, "[f]ollowing review of the medical records," the DOC medical director "shall make a medical determination of eligibility or ineligibility and issue a memo to the Commissioner of the Department of Corrections detailing the same." Ibid. Should the physicians indicate that an applicant suffers from either a terminal condition or permanent physical incapacity, the DOC's Division of Operations "shall promptly issue to the inmate a Certificate of Eligibility." N.J.S.A. 30:4-123.51e(d)(2). Upon issuance, an inmate may petition the Superior Court for compassionate release. Ibid.

---

[8] Effective February 3, 2025, the regulation was updated by the substitution of "Health Compliance Unit" for "health services unit." See 56 N.J.R. 1771(a), 57 N.J.R. 260(a). No other changes were made, and we use the language in effect at the time of M.R.'s application.

17

B.

As is apparent from the text of N.J.S.A. 30:4-123.51e, the CRA does not expressly require that an attesting physician's "diagnosis" be based on a physical examination; rather, it is silent as to the process attesting physicians must follow to render their diagnoses. And although N.J.A.C. 10A:16-8.6(a) references an "examination," it too is silent as to the nature of the examination required.

Importantly, both parties concede that the CRA and the relevant regulation make no explicit reference to "physical examinations." Rather, M.R. contends that both implicitly require a physical examination because the "common understanding" and the "medical profession's understanding" of making a "diagnosis" mandate a physical examination. We disagree.

1.

Black's Law Dictionary defines "diagnosis" as "[t]he determination of a medical condition (such as a disease) by physical examination or by study of its symptoms." 569 (12th ed. 2024) (emphasis added). Notably, it distinguishes a "clinical diagnosis" from a "physical diagnosis," but the definition of "diagnosis" contemplates both. Ibid. The Cambridge Dictionary, proffered by M.R., defines "diagnosis" as "the making of a judgment about the exact character of a disease or other problem, esp[ecially] after an

18

examination." https://dictionary.cambridge.org/dictionary/english/diagnosis. This definition, likewise, makes no mention of a "physical" examination.

If the Legislature intended that diagnoses be rendered solely through "physical" examinations, it would have stated as much, as it has done on numerous other occasions. See, e.g., N.J.S.A. 34:15-19 (the Workers' Compensation Law states, "if so requested by his employer, [an employee] must submit himself for physical examination"); N.J.S.A. 59:6-4 (the Tort Claims Act states that a public entity is not "liable for injury caused by the failure to make a physical or mental examination"); N.J.S.A. 18A:35-4.8 (the Parents Rights to Conscience Act states that "[n]o pupil whose parent or guardian objects to such pupil receiving medical treatment or medical examination or physical examination shall be compelled to receive such treatment or examination"). Neither the ordinary definition of "diagnosis," nor the Legislature's practice of specifying the type of examination it deems necessary, provides us with a basis to read "physical examination" into the unqualified use of "diagnosis" as applied in the CRA.

2.

Similarly, we find no support for M.R.'s argument that the reference to "examinations" in N.J.A.C. 10A:16-8.6(a) must be read to require a "physical" examination.

19

The Cambridge Dictionary defines "examination" as "the act or process of carefully looking at someone or something to learn about its condition or to discover facts." https://dictionary.cambridge.org/us/dictionary/english/examination. Similarly, Stedman's Medical Dictionary defines "examination" as "[a]ny investigation or inspection made for the purpose of diagnosis; usually qualified by the method used." 679 (28th ed. 2006) (emphasis added). Stedman's identifies numerous qualifiers used to indicate specific examination types, including "physical," "mental status," "postmortem," and others. Id. at 680. No such qualifier was written into the DOC regulation.

On its face, the regulation is consistent with the CRA as neither mentions nor requires "physical" examinations. Once again, had the DOC intended to include such a qualifier, it "could have very easily done so." J.H. v. R & M Tagliareni, LLC, 239 N.J. 198, 215 (2019). That is evidenced by other DOC and Parole Board regulations that expressly include specific examination methods. See, e.g., N.J.A.C. 10A:16-2.11 (detailing the routine occasions on which medical examinations will be performed on inmates, including "physical examination[s]"); N.J.A.C. 10A:31-13.9 (explaining that, "[p]rior to placement in [a] general population or housing area, all inmates shall receive," at a minimum, "[a] medical screening" and "[a] physical examination"); N.J.A.C. 10A:71-6.11 (parolees must cooperate "in any

20

medical and/or psychological examination or test as directed by the assigned parole officer").

Moreover, as explained in the previous section, N.J.A.C. 10A:16-8.6(a)'s requirement that two physicians "complete the required examinations" references the reviews necessary to arrive at the "[m]edical diagnosis" described in section -8.5, which is the same diagnosis described in the CRA, N.J.S.A. 30:4-123.51e(b). Our determination, with respect to the statute, that a "diagnosis" does not require a physical examination thus applies with equal force to the regulation.

As with the above statutory discussion, we decline to write in additional qualifiers where the DOC has chosen not to do so. Accordingly, we conclude that the DOC regulation allows physicians to exercise their discretion and expertise to implement the method they deem appropriate on a case-by-case basis and does not mandate a physical examination of every CRA applicant.

Contrary to M.R.'s argument, our straightforward, plain-language reading does not "reduce[] specific language [in the regulation] to mere surplusage." See DKM Residential Props. Corp., 182 N.J. at 307. According to the regulation, after physicians "complete the required examinations," the medical director must complete a "review of the medical records." N.J.A.C. 10A:16-8.6(a). M.R. contends that these preceding phrases indicate separate

and distinct obligations:  namely, that attesting physicians must complete a "physical" examination, and the medical director must complete a medical record review.

As noted earlier, however, courts "read the words in context with related provisions so as to give sense to the legislation or regulatory scheme as a whole."  A.B. v. Div. of Med. Assistance & Health Servs., 407 N.J. Super. 330, 340 (App. Div. 2009).  Here, a comprehensive reading of the regulation is instructive.  The regulation provides that the physicians must "complete the required examinations and forward their attestations, and all related medical records" to the medical director.  N.J.A.C. 10A:16-8.6(a) (emphasis added).  Accordingly, we observe two distinct obligations:  first, physicians must conduct an examination to provide the requisite medical diagnosis, which we hold can be accomplished by reviewing an applicant's electronic medical record, and second, the medical director must assess the accuracy of the physicians' conclusions by reviewing the relevant portions of the applicant's medical record.  Such a construct is not "surplusage," but rather, reflects accountability and administrative oversight of the physicians' medical conclusions.

Finally, we do not agree with M.R.'s contention that reading the regulation not to require a physical examination contradicts the CRA's aim of

22

expanding compassionate release. The Legislature did not effectuate its goal by establishing release quotas or mandating physical examinations. It did so by granting all inmates the right to apply and by streamlining the application process. See A.M., 252 N.J. at 457. Because the DOC designates off-site physicians to render diagnoses, moreover, the financial and logistical challenges of mandating two contemporaneous physical examinations for every application would not necessarily streamline compassionate release; in fact, such a requirement runs a substantial risk of hindering it.

In practice, medical record review can work in an inmate's favor, as evidenced by M.R.'s final application for compassionate release. In May 2024, MRI scans revealed the recurrence of an inoperable brain tumor. Three days following his request for reevaluation, the attesting physicians diagnosed M.R. with a terminal condition after consulting his electronic medical record. The following week, M.R. was granted a Certificate of Eligibility. This illustrates the efficiency of medical record review in the proper context.

Importantly, should an inmate's medical record provide insufficient information to render an accurate diagnosis, nothing in the CRA prevents attesting physicians from conducting a physical examination to supplement their findings, as occurred in A.M., where an inmate was diagnosed with a terminal condition and granted a Certificate of Eligibility following two in-

person examinations. 252 N.J. at 443-44. The decision of whether a physical examination should be undertaken, however, has been left to the medical professionals.

C.

Having determined that physical examinations are not mandated under either the CRA or its regulatory scheme, we next turn to the DOC's August 2023 decision to deny M.R. a Certificate of Eligibility on the grounds that he was neither terminal nor physically incapacitated, and we examine whether that decision was supported by substantial evidence in the record or whether it was arbitrary, capricious, or unreasonable. Upon careful sifting of the record, see Quest Acad. Charter Sch., 216 N.J. at 387, we cannot conclude that the DOC's determination in this case -- that M.R. did not suffer from a permanent physical incapacity -- was supported by substantial credible record evidence.

Under the CRA, a diagnosis of permanent physical incapacity requires a multifactor analysis. N.J.S.A. 30:4-123.51e(*l*). An inmate must demonstrate

> by clear and convincing evidence that (1) he has a medical condition that did not exist at the time of sentencing; (2) that medical condition renders him permanently unable to perform two or more activities of basic daily living; and (3) as a result of the inmate's inability to perform those activities, he requires twenty-four hour care.
>
> [State v. F.E.D., 251 N.J. 505, 531 (2022).]

24

In F.E.D., we held that the requisite activities under focus for these purposes include "eating, mobility, bathing, dressing, using a toilet, and transfers." Id. at 529. An inmate's electronic medical record may facilitate the analysis, but only insofar as it is sufficiently comprehensive and contemporaneous to adequately reflect the inmate's current physical capabilities.

Here, although we are somewhat "hobbled by the state of the record," Zimmerman v. Sussex Cnty. Educ. Servs. Comm'n, 237 N.J. 465, 480 (2019), we nevertheless conclude that the medical entries relied upon by the DOC medical director and the DOC's designated physicians did not provide an adequate foundation upon which to conclude that, as of August 23, 2023, M.R. was not permanently physically incapacitated. Likewise, the physicians' corresponding reports and the medical director's memorandum do not allow for meaningful appellate review.

Dr. Hawes's August 2023 report, which noted that M.R. had "moderate-severe dysarthria and suspected voice impairment, as evidenced by imprecise articulation, decreased secretion management, irregular/slow rate of speech and strained and breathy vocal quality," was taken from a speech language pathology evaluation compiled four months earlier on April 27, 2023; Dr. Pomerantz's report repeated those same dated observations. Neither attesting physician referenced the source for this diagnosis or the date of the evaluation.

More troubling, in stating that M.R. suffered from "residual neurologic deficits (dysarthria, cranial 7 palsy, lack of coordination)," Dr. Hawes copied Dr. Hrishikesan's November 2022 consultation report created nine months before. Dr. Kaldany included the same dated information in his August 2023 memorandum to the DOC Commissioner. Once again, neither included the source or date from which the cited information was obtained.

The DOC argues that "the doctors, using their expertise, will know if the circumstances/symptoms suggest a need for an updated review . . . or whether they indicate the condition is worsening." Due to the potential for dynamic and unpredictable changes in the condition of inmates suffering from rapidly declining physical or mental health, however, contemporaneity is essential, particularly for a statute written in the present tense: N.J.S.A. 30:4-123.51e(b) requires a determination of "whether the inmate is eligible for compassionate release." (emphasis added). Given that, as early as September 2020, M.R. suffered from "progressive" and "residual" neurological deficits and struggled with several of the relevant activities of basic daily living, we conclude that the DOC and its attesting physicians should have ascertained the current state of M.R.'s physical condition before concluding that he was not physically incapacitated as of August 2023.

Although not the basis of this appeal, M.R.'s February 2023 application similarly underscores the timeliness problems inherent in the DOC's implementation of the CRA, as Dr. Pomerantz erroneously concluded that M.R. suffered from a terminal condition but was not physically incapacitated while relying upon a neurology report compiled more than twenty-nine months earlier.

Moreover, the physicians' August 2023 attestation reports provided insufficient explanation for why M.R. did not suffer from a permanent physical incapacity; each simply stated, "No -- does not require 24-hour care." The DOC argues that, under the CRA, further explanation is not required if the physicians conclude that an inmate does not suffer from a permanent physical incapacity. That interpretation, however, is inconsistent with well-established law, as it denies the opportunity for meaningful appellate review. See ACLU of N.J. v. Hendricks, 233 N.J. 181, 200 (2018) ("An action that comes to us as a result of final agency action must have a fully developed record so that a reviewing court may engage in meaningful appellate review.").

Moving forward, attesting physicians and the DOC medical director must provide sufficient explanation to better inform and properly support the DOC's final agency decision to grant or deny a Certificate of Eligibility. At minimum, attesting physicians should cite which medical record supported

27

their diagnosis and the date on which the relied-upon entry was compiled. Although the DOC contends that providing additional information "would invariably delay the process for all applicants," we are unpersuaded. Furthermore, information about an applicant's physical capacity should be reasonably contemporaneous and reference the applicant's capability to perform threshold daily activities as described by this Court in F.E.D. -- a case that postdated the operative statute and implementing regulation. "In the long run, such an explanation would promote transparency and help avoid litigation." Zimmerman, 237 N.J. at 482.

Notably, we do not conclude that M.R. suffered from a permanent physical incapacity in August 2023. Rather, we hold that the DOC's decision to deny M.R. a Certificate of Eligibility on that basis was arbitrary, capricious, and unreasonable. This Court cannot rubber-stamp agency decisions that rely upon conclusory findings that fail to comport with the contemporaneity required by the CRA. Nor can we ignore the basic underpinning of compassionate release: "Our treatment of those within our prisons is a reflection of our humanity." F.E.D., 251 N.J. at 522 (quoting Off. of the Governor, Press Release: Governor Murphy Signs Sentencing Reform Legislation (Oct. 19, 2020)).

28

V.

For those reasons, we reverse the judgment of the Appellate Division. Although we conclude that physical examinations are not required by the CRA, we hold that the DOC's decision to deny M.R. a Certificate of Eligibility in August 2023 was arbitrary, capricious, and unreasonable.


CHIEF JUSTICE RABNER and JUSTICES PATTERSON, PIERRE-LOUIS, WAINER APTER, FASCIALE, and NORIEGA join in JUSTICE HOFFMAN's opinion.

29